UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ABRAHAM I. AWWAD,

    Plaintiff,

v.    Case No. 8:11-cv-1638-T-24 TBM

LARGO MEDICAL CENTER, INC.,

    Defendant.
_____/

**ORDER**

This cause comes before the Court on Defendant's Motion to Dismiss. (Doc. No. 9). Plaintiff opposes the motion. (Doc. No. 16). As explained below, the motion is granted as to Count III only.

**I. Standard of Review**

In deciding a motion to dismiss, the district court is required to view the complaint in the light most favorable to the plaintiff. See Murphy v. Federal Deposit Ins. Corp., 208 F.3d 959, 962 (11th Cir. 2000)(citing Kirby v. Siegelman, 195 F.3d 1285, 1289 (11th Cir. 1999)). The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. Instead, Rule 8(a)(2) requires a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. See Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007)(citation omitted). As such, a plaintiff is required to allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1965 (citation omitted). While the Court must assume that all of the allegations in the complaint are true, dismissal is appropriate if the allegations do not "raise [the plaintiff's] right

to relief above the speculative level." Id. (citation omitted). The standard on a 12(b)(6) motion is not whether the plaintiff will ultimately prevail in his or her theories, but whether the allegations are sufficient to allow the plaintiff to conduct discovery in an attempt to prove the allegations. See Jackam v. Hospital Corp. of Am. Mideast, Ltd., 800 F.2d 1577, 1579 (11th Cir. 1986).

## II. Background

Plaintiff Abraham Awwad alleges the following in his complaint (Doc. No. 1): Plaintiff is a physician. He was born in Jerusalem in what was, at the time of his birth, TransJordan and which is now commonly called Palestine. He moved to Florida when he was thirteen years old, and he is a United States citizen. In his complaint, he identifies himself as a Palestinian and states that he is not white.

Plaintiff was first granted medical staff privileges at Defendant Largo Medical Center, Inc. ("LMC") in 1999, and his privileges were renewed until 2009. By 2006, several individuals who held animosity against Plaintiff because he is Palestinian rose to positions of leadership at LMC. For example, Dr. Nutinsky allegedly regularly made derogatory remarks about Palestinians generally and Plaintiff specifically. Dr. Nutinsky allegedly regularly referred to Plaintiff as a terrorist and once threatened to get his gun and shoot Plaintiff.

Dr. Feinman also allegedly regularly made negative comments about Plaintiff being Palestinian. For example, Dr. Feinman criticized Plaintiff for raising quality of care issues at LMC and stated, "That's not how we do things at Largo Medical. You're practicing medicine the Palestinian way."

Plaintiff admits that he was outspoken about quality of care issues at LMC. One of the

2

quality care complaints that he filed with the Florida Agency for Health Care Administration ("AHCA") involved Patient Y. Patient Y died in December of 2008 after LMC's contract dialysis company allegedly did not show up to administer dialysis ordered by Plaintiff. After Patient Y died, LMC sought to revoke Plaintiff's medical staff privileges at LMC. LMC did not investigate or discipline any other physician in connection with Patient Y's death.

LMC purportedly submitted Patient Y's medical records to two outside physicians solely to determine whether Plaintiff's care met the appropriate standard of care. Plaintiff contends that LMC committed intentional fraud in attempting to ensure negative reviews of Plaintiff by intentionally failing to provide all of the medical records for Patient Y to the physician experts. The records provided to both experts included only the first lab that Plaintiff ordered on the night of Patient Y's admission and the last lab that Plaintiff ordered the morning of Patient Y's death. Plaintiff contends that LMC did not provide the experts with the three intervening labs that he ordered the evening of Patient Y's admission and the second day of his admission. Based on these incomplete records, the experts concluded that Plaintiff did not order sufficient labs.

Plaintiff informed LMC that it misrepresented to the experts that it had produced all labs. Additionally, Plaintiff independently obtained the labs on LMC's medical records computer system. When these labs were shown to LMC's only testifying expert, he admitted that Plaintiff had, in fact, ordered sufficient labs and withdrew his criticism that Plaintiff should have ordered dialysis earlier. LMC's testifying expert further testified that there was a lot of blame to go around regarding Patient Y's death, but that he was only asked to review Plaintiff's actions.

Despite the fact that LMC's testifying expert withdrew his criticism of Plaintiff, LMC

still revoked Plaintiff's staff privileges. LMC stated that it revoked Plaintiff's privileges, in part, because he was disruptive. Thereafter, LMC told Plaintiff that it would not accept or process either a renewal or a new application from him for staff privileges. Plaintiff claims that the real reason that LMC revoked and failed to renew his medical staff privileges was because he is Palestinian. Plaintiff cites several incidents in his complaint in which he was treated less favorably than his non-Palestinian counterparts.

Additionally, Plaintiff points out that LMC adopted medical staff bylaws to govern the terms and conditions for granting, renewing, and revoking medical staff privileges at LMC and that the bylaws constitute an enforceable contract between LMC and the medical staff. As such, Plaintiff contends that LMC breached the bylaws by revoking and failing to renew his privileges at LMC.

Specifically, Plaintiff alleges that in order to ensure that Plaintiff's privileges were revoked, LMC appointed biased members to the hearing committee, and at least two of the three members were prohibited by the bylaws from serving. Plaintiff contends that the bylaws prohibited Dr. Requena from serving on the hearing committee, because Dr. Requena served as a fact-finder on the committee that initially investigated the alleged incidents of Plaintiff's disruptive conduct.

Likewise, Plaintiff contends that the bylaws required that members of the hearing committee be members of the medical staff at LMC, yet Dr. Ramamurthy was appointed to the hearing committee despite the fact that he does not hold medical staff membership or clinical privileges at LMC. In March of 2010–after the hearing committee recommended that Plaintiff's privileges be revoked, and after he appealed that decision–LMC amended the bylaws to provide

4

that if there are not sufficient members of the medical staff at LMC willing or able to serve on the hearing committee, then a Practitioner that is not part of the medical staff at LMC can be appointed.[1] Plaintiff contends that LMC committed intentional fraud by amending the bylaws and then falsely representing to him that the amended bylaws governed his appeal.

Additionally, Plaintiff alleges that LMC breached the bylaws by charging him with disruptive conduct, because LMC did not follow the procedures set forth in Section 3.19 of the bylaws. Section 3.19 sets forth the procedures that must be followed prior to charging an LMC Practitioner with disruptive conduct, and those procedures require notice, documentation, meeting with the accused Practitioner to give him an opportunity to respond to the allegations, and a second meeting with the accused Practitioner if another report of disruptive conduct is made. Plaintiff contends that LMC did not comply with any of these requirements.

On July 25, 2011, Plaintiff filed the instant lawsuit. He asserts four claims in his complaint relating to LMC's revocation and failure to renew his staff privileges–(1) Count I is a damages claim for LMC's alleged violation of 42 U.S.C. § 1981, (2) Count II seeks injunctive relief for LMC's alleged violation of 42 U.S.C. § 1981, (3) Count III is a damages claim for LMC's alleged breaches of the bylaws, and (4) Count IV seeks injunctive relief for LMC's alleged breaches of the bylaws. In response to the complaint, LMC moves to dismiss all four claims.

### III. Motion to Dismiss

LMC argues that all four claims must be dismissed. Specifically, LMC argues that: (1)

---

[1] On December 11, 2009, the hearing committee recommended that Plaintiff's privileges be revoked, and he appealed that decision on January 21, 2010.

Plaintiff's § 1981 claims fail, because his § 1981 claims are based on discrimination due to his national origin; and (2) Plaintiff's breach of bylaws claims fail due to peer review immunity. Accordingly, the Court will address each argument.

### A. Section 1981

LMC moves to dismiss Plaintiff's § 1981 claims, because his § 1981 claims are based on discrimination due to his national origin. LMC argues that § 1981 claims must be based on race discrimination, and as a result, Plaintiff's § 1981 claims based on national origin discrimination must be dismissed.

Section 1981 provides, in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). The Supreme Court addressed the issue of the type of discrimination prohibited by § 1981 is the case of Saint Francis College v. Al-Khazraji, 481 U.S. 604 (1987).

One of the issues before the Court in Saint Francis was whether the respondent, who was a U.S. citizen that had been born in Iraq, had sufficiently alleged race discrimination within the meaning of § 1981. See id. at 606, 609. The respondent had alleged that he was a professor and was denied tenure because he was of the Arabian race. See id. at 609. In determining whether the respondent had sufficiently alleged race discrimination within the meaning of § 1981, the Supreme Court stated the following:

> Although § 1981 does not itself use the word "race," the Court has construed the section to forbid all "racial" discrimination in the making of private as well as public contracts. . . . The issue is whether respondent has alleged racial discrimination within the meaning of § 1981.
>
> \*      \*      \*

6

Petitioner's submission [that respondent is a Caucasian and cannot allege the kind of discrimination that § 1981 forbids] rests on the assumption that all those who might be deemed Caucasians today were thought to be of the same race when § 1981 became law in the 19th century; and it may be that a variety of ethnic groups, including Arabs, are now considered to be within the Caucasian race. The understanding of "race" in the 19th century, however, was different. Plainly, all those who might be deemed Caucasian today were not thought to be of the same race at the time § 1981 became law.

\*   \*   \*

Encyclopedias of the 19th century . . . described race in terms of ethnic groups, which is a narrower concept of race than petitioners urge. Encyclopedia Americana in 1858, for example, referred to various races such as Finns, gypsies, Basques, and Hebrews. The 1863 version of the New American Cyclopaedia divided the Arabs into a number of subsidiary races, represented the Hebrews as of the Semitic race, and identified numerous other groups as constituting races, including Swedes, Norwegians, Germans, Greeks, Finns, Italians, Spanish, Mongolians, Russians, and the like.

\*   \*   \*

These . . . encyclopedic sources . . . [make it] clear that they do not support the claim that for the purposes of § 1981, Arabs, Englishmen, Germans, and certain other ethnic groups are to be considered a single race. We would expect the legislative history of § 1981 . . . to reflect this common understanding, which it surely does. The debates are replete with references to the Scandinavian races, as well as the Chinese, Latin, Spanish, and Anglo-Saxon races. Jews, Mexicans, blacks, and Mongolians were similarly categorized. Gypsies were referred to as a race[, as were the Germans].

\*   \*   \*

Based on the history of § 1981, we have little trouble in concluding that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics. Such discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory. . . . [Section] 1981 "at a minimum," reaches discrimination against an individual "because he or she is genetically part of an ethnically and physiognomically distinctive sub-grouping of *homo sapiens*." It is clear from our holding, however, that a distinctive physiognomy is not essential to qualify for § 1981 protection. If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981.

Id. at 609-613 (internal citations and footnotes omitted)(emphasis added).

7

Justice Brennan filed a concurring opinion, in which he made the following comments regarding the difficulty in distinguishing race and national origin:

> I write separately only to point out that the line between discrimination based on "ancestry or ethnic characteristics," and discrimination based on "place or nation of . . . origin," is not a bright one. It is true that one's ancestry–the ethnic group from which an individual and his or her ancestors are descended–is not necessarily the same as one's national origin–the country "where a person was *born,* or, more broadly, the country from which his or her ancestors *came*." Often, however, the two are identical as a factual matter: one was born in the nation whose primary stock is one's own ethnic group. Moreover, national origin claims have been treated as ancestry or ethnicity claims in some circumstances. . . . I therefore read the Court's opinion to state only that discrimination based on *birthplace alone* is insufficient to state a claim under § 1981.

Id. at 614 (internal citations omitted)(emphasis added).

Based on the above, it appears that the Supreme Court interprets the reach of § 1981 more broadly than LMC does, because the Supreme Court stated that "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics." Id. at 613. Furthermore, Justice Brennan recognized that often race and national origin "are identical as a factual matter: one [may be] . . . born in the nation whose primary stock is one's own ethnic group." Id. at 614. As such, this Court agrees with Plaintiff that his complaint is not subject to dismissal at this time, and instead, he should be given the opportunity to prove that the discrimination that he faced was due to his Palestinian ancestry and/or ethnicity, as opposed to the discrimination being based solely on the fact that he was born in the area that is now referred to as Palestine. See Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518 (3d Cir. 1986); Abdullahi v. Prada USA Corp., 520 F.3d 710, 712 (7th Cir. 2008)(ruling that dismissal of the plaintiff's § 1981 claim was premature, and concluding that § 1981 prohibits discrimination

against a person because they are a "member of a foreign 'race'").

Additionally, the Court notes that Plaintiff alleges both that he is Palestinian and that he is not white within the same sentence of his complaint. Thus, it appears that Plaintiff is alleging race discrimination by stating in the complaint that he is not white and that his reference to being Palestinian is his attempt to further define his non-white race (i.e., his Palestinian ancestry). Accordingly, the Court finds that LMC's motion to dismiss Plaintiff's § 1981 claims must be denied.

**B. Breach of Bylaws**

Plaintiff has asserted two claims for breach of the bylaws–Counts III and IV.[2] The claims are identical, except that Count III requests damages and Count IV requests injunctive relief.

LMC moves to dismiss these claims based on peer review immunity under Florida Statute § 395.0193(5). LMC points out that § 395.0193 provides that licensed medical facilities must provide for a peer review process for investigating and disciplining doctors at the facility, and subsection (5) provides peer review immunity in certain situations. Specifically, § 395.0193(5) provides, in pertinent part, that "[t]here shall be no monetary liability on the part of, and no cause of action for damages against, any licensed facility . . . for any action taken without intentional fraud in carrying out the provisions of this section."

It is clear to the Court that § 395.0193(5) does not bar Plaintiff's claim in Count IV for breach of the bylaws relating to the termination of his staff privileges, since he is only requesting

---

[2]Florida recognizes "that hospital bylaws become a binding and enforceable contract between the hospital and its medical staff when adopted by a hospital's governing board." Naples Community Hospital, Inc. v. Hussey, 918 So. 2d 323, 325 (Fla. 2d DCA 2006)(citations omitted).

9

injunctive relief, and § 395.0193(5) only bars claims for damages. With regards to Count III, Plaintiff argues that his claim is simply one for breach of the bylaws, and thus, peer review immunity is inapplicable. LMC responds that § 395.0193(5) is implicated by Plaintiff's damages claim in Count III, because Count III is based on alleged violations of the bylaws that occurred in connection with the peer review proceedings.

The Court agrees with LMC that because Count III is based on the actions that LMC took in the peer review proceedings, § 395.0193(5) is implicated.[3] See Cedars Healthcare Group, Ltd. v. Mehta, 16 So. 3d 914, 916-17 (Fla. 3d DCA 2009)(finding that § 395.0193(5) was implicated when the plaintiff asserted a breach of bylaws claim based on his referral to the hospital's peer review committee and resulting effect on his privileges).[4] As such, pursuant to § 395.0193(5), Plaintiff must allege that LMC committed intentional fraud in carrying out its peer review

---

[3]The Court notes that Plaintiff cites several cases in support of his contention that Count III is simply a breach of contract claim that does not implicate § 395.0193(5). See, e.g., Hospital Corp. of Lake Worth v. Romaguera, 511 So. 2d 559 (Fla. 4th DCA 1987); University Community Hospital, Inc. v. Wilson, 1 So. 3d 206 (Fla. 2d DCA 2009); Lawnwood Medical Center Inc. v. Sadow, 43 So. 3d 710 (Fla. 4th DCA 2010). However, the cases of Romaguera and Wilson are distinguishable, because the doctors in those cases sued hospitals for breach of contract for terminating their privileges when the hospitals terminated their exclusive contracts with the entities that the doctors were associated with in order for the hospitals to enter into exclusive contracts with other entities. Likewise, Sadow is also distinguishable, because Sadow sued the hospital for breaching its bylaws when the hospital granted Downing exclusive privileges for performing cardiovascular surgery (despite the fact that the bylaws did not allow such an exclusive privilege to be given), which resulted in Sadow being denied the privilege of also performing cardiovascular surgery at that hospital. Thus, unlike the instant case, the breach of bylaws claims in the cases cited by Plaintiff did not relate in any way to peer review disciplinary proceedings required under § 395.0193.

[4]The Court notes that Plaintiff has misread the Mehta case, because Plaintiff argues in his response brief that Mehta does not involve a breach of contract claim based on bylaws being breached. However, footnote 1 of the Mehta case clearly states that the plaintiff asserted a claim for breach of the hospital bylaws. See Mehta, 16 So. 3d at 916, n.1.

10

obligations in order for Count III to survive LMC's motion to dismiss.[5]

Plaintiff contends that he sufficiently alleged intentional fraud by LMC. Specifically, Plaintiff alleged that LMC committed intentional fraud when: (1) in attempting to ensure negative reviews of Plaintiff, LMC intentionally failed to provide all of the medical records for Patient Y to the physician experts that were reviewing Plaintiff's conduct, and (2) it amended the bylaws and then falsely represented to him that the amended bylaws governed his appeal. LMC responds that those are not sufficient allegations of fraud, and Plaintiff has failed to address LMC's argument.

Specifically, LMC argued in its motion to dismiss that it could not have committed intentional fraud when it failed to provide all of the medical records for Patient Y to the physician experts that were reviewing Plaintiff's conduct, because Plaintiff provided the experts with the missing labs. As such, argues LMC, there could be no fraud because there was no reliance by the experts on the incomplete medical records. Plaintiff did not respond to this argument, and therefore, the Court views his silence as agreement with LMC's argument.

Likewise, LMC argued in its motion to dismiss that Plaintiff did not sufficiently allege that it committed intentional fraud when it amended the bylaws and then falsely represented to Plaintiff that the amended bylaws governed his appeal. Again, Plaintiff did not respond to this argument, and therefore, the Court views his silence as agreement with LMC's argument.

The Court notes that it appears that Plaintiff views a violation of the bylaws, in itself, to be a sufficient basis for a breach of bylaws claim, even if the violation of the bylaws occurred in

---

[5]LMC contends that Plaintiff must allege *extrinsic* evidence of intentional fraud. However, there is no such requirement that the evidence of fraud be extrinsic evidence. See Mehta, 16 So. 3d at 917, n.2.

11

connection with a peer review proceeding. While such an argument may have been successful when a prior version of the peer review immunity statute existed that only required lack of good faith or malice to be alleged in order to avoid dismissal based on immunity,[6] the current version of the statute requires allegations of intentional fraud in order to state a claim for damages resulting from a hospital's carrying out its peer review obligations. Since Plaintiff's allegations relate to LMC failing to follow its own bylaws without sufficiently alleging intentional fraud, Plaintiff's damages claim for breach of bylaws in Count III must be dismissed.

**IV. Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Defendant LMC's Motion for Leave to File a Reply (Doc. No. 17) is **DENIED**.

(2) Defendant LMC's Motion to Dismiss (Doc. No. 9) is **GRANTED IN PART AND DENIED IN PART**: The motion is **GRANTED** as to Plaintiff's damages claim for breach of bylaws in Count III; otherwise, the motion is **DENIED**.

**DONE AND ORDERED** at Tampa, Florida, this 20th day of October, 2011.

Copies to:
Counsel of Record

SUSAN C. BUCKLEW
United States District Judge

---

[6] A prior version of the peer review immunity statute, § 395.065(2), provided that "[t]here shall be no liability on the part of, and no cause of action of any nature shall arise against, any hospital . . . for any action taken in good faith and without malice in carrying out the provisions of this section." Thus, while the plaintiff's claims in Lawler v. Eugene Wuesthoff Memorial Hospital Association, 497 So. 2d 1261 (Fla. 5th DCA 1986), for breach of contract based on the hospital's failure to follow the bylaws in its decision to terminate his privileges are quite similar to Plaintiff's breach of bylaws claims in the instant case, the applicable peer review immunity statute in Lawler (§ 395.065(2)) contained the more relaxed standard of requiring only lack of good faith or malice in order to state a claim for damages.