UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ABRAHAM I. AWWAD,

    Plaintiff,

v.                                          Case No. 8:11-cv-1638-T-24 TBM

LARGO MEDICAL CENTER, INC.,

    Defendant.
_____/

## ORDER

This cause comes before the Court on Defendant's Motion for Summary Judgment. (Doc. No. 179). Plaintiff opposes the motion. (Doc. No. 195). The Court held a hearing on the motion on August 15, 2013. As explained below, the Court grants summary judgment on Plaintiff's federal claims and declines to exercise supplemental jurisdiction over the remaining state law claims.

**I. Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must draw all inferences from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. See Porter v. Ray, 461 F.3d 1315, 1320 (11th Cir. 2006)(citation omitted). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. See id. (citation omitted). When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate

specific facts showing there is a genuine issue for trial. See id. (citation omitted).

## II. Background[1]

Plaintiff Abraham Awwad is a Palestinian doctor that is Board Certified in Nephrology. (Doc. No. S-199, ¶ 1, 4). Plaintiff applied for and obtained medical staff privileges at Defendant Largo Medical Center ("LMC") and Northside Hospital ("Northside").[2] (Doc. No. S-199, Ex. 1, ¶ 9). Plaintiff had medical staff privileges at LMC from 1999 through May of 2011, when LMC revoked Plaintiff's medical staff privileges. (Doc. No. S-199, Ex. 1, ¶ 12, 15, 70).

### A. Plaintiff's Quality of Care Complaints

Plaintiff was very outspoken about his serious concerns regarding the quality of care provided by LMC and Northside, including concerns regarding the use of an outside dialysis company to dialyze patients. (Doc. No. S-199, Ex. 1, ¶ 18). Plaintiff was concerned that the outside dialysis nurses were cutting dialysis treatments short, falsely charting the length of the dialysis actually given, intentionally crashing patients, and not showing up on time. (Doc. No. S-199, Ex. 1, ¶ 18).

Plaintiff first brought his concerns regarding the quality of dialysis care to LMC and Northside administrators in 2006. (Doc. No. S-199, Ex. 1, ¶ 20). Plaintiff suggested that a reasonable solution would be for LMC to start its own dialysis program. (Doc. No. S-199, Ex. 1, ¶ 20). Plaintiff's concerns were ignored. (Doc. No. S-199, Ex. 1, ¶ 25). At some point, Plaintiff

---

[1]Some of the factual background is taken directly from Plaintiff's statement of facts in his response brief without an evidentiary citation to the record. The record in this case is voluminous, and the Court is construing the factual background according to Plaintiff's version of the facts.

[2]Both Northside and Defendant LMC are owned by HCA Holdings, Inc. ("HCA"). (Doc. No. S-199, Ex. 1, ¶ 9).

began raising his concerns with the Florida Agency for Health Care Administration ("AHCA"). In February of 2008, the AHCA prohibited Northside from providing dialysis for a month, which resulted in millions of dollars in losses and embarrassing media attention.

In 2009, Plaintiff wrote to the Chief of Staff (Dr. Feinman), the LMC Board of Trustees, and the Medical Executive Committee ("MEC") and reiterated his quality of care concerns that he raised in 2006. (Doc. No. S-199, Ex. 1, ¶ 23). LMC ignored Plaintiff's concerns. (Doc. No. S-199, Ex. 1, ¶ 25).

An example of the seriousness of Plaintiff's concerns relates to Patient J.B. (Doc. No. S-199, Ex. 1, ¶ 46). J.B. died on December 28, 2008 after LMC's contract dialysis company did not show up on time to administer dialysis that Plaintiff had ordered. (Doc. No. S-199, Ex. 1, ¶ 46). Plaintiff reported J.B.'s case to the AHCA. (Doc. No. S-199, Ex. 1, ¶ 47). The AHCA investigated J.B.'s case and five other patients' cases on January 9, 2009, and the AHCA concluded that substandard care had occurred (although it does not appear that the AHCA found any fault by Plaintiff). (Doc. No. S-199, Ex. 1, ¶ 47, 68, fn.1; Doc. No. S-199, Ex. 1-L). Thereafter, on June 12, 2009, a newspaper article was published about J.B.'s death at LMC and how Plaintiff believed that J.B.'s death could have been avoided. (Doc. No. S-199, Ex. 1-J).

It is unclear how many complaints Plaintiff made to the AHCA, but it appears that Plaintiff made another complaint to the AHCA after the complaint relating to J.B. (Doc. No. S-199, Ex. 1-G). The AHCA investigated LMC again in November of 2009 and found additional violations. (Doc. No. S-199, Ex. 1-G).

**B. Alleged Racial Remarks**

During his deposition, Plaintiff identified three individuals who made inappropriate

3

remarks to him regarding his Palestinian race. The three individuals are Dr. Nutinsky, Mr. Satcher, and Dr. Feinman.[3] Plaintiff, however, fails to specifically identify when these alleged remarks occurred. (Doc. No. S-192, Ex. 4: Pla. depo, p. 333-59).

### 1. Nutinsky

With regards to Nutinsky, Plaintiff identifies three incidents. (Doc. No. S-192, Ex. 4: Pla. depo, p. 333-50). The first incident occurred around 1997.[4] Plaintiff contends that he and Nutinsky (who was working on the medical staff at the time) were in LMC's physicians' lounge around the time that a teenager in the state of Maryland committed a crime and fled to Israel and state prosecutors were trying to extradite the teen. (Doc. No. S-192, Ex. 4: Pla. depo, p. 337, 341-42). Plaintiff stated to Nutinsky that the teen should stand trial in the United States, because that is where the teen committed the crime. (Doc. No. S-192, Ex. 4: Pla. depo, p. 337). Nutinsky responded that Plaintiff was saying that because he is a Palestinian. (Doc. No. S-192, Ex. 4: Pla. depo, p. 338). Plaintiff attempted to defend his statement, and Nutinsky became angry and kept saying that Plaintiff felt that way because he is a Palestinian. (Doc. No. S-192, Ex. 4: Pla. depo, p. 338). Additionally, Nutinsky stated that Plaintiff should not be critical of Israel because Plaintiff is a "Palestinian terrorist." (Doc. No. S-192, Ex. 4: Pla. depo, p. 339).

---

[3]Plaintiff was asked at his deposition whether there were any other statements (other than those set forth in this order) made by anybody at LMC that would suggest that he was being discriminated against because he is Palestinian, and Plaintiff responded that he could not recall any. (Doc. No. S-192, Ex. 4: Pla. depo, p. 359).

[4]Plaintiff does not identify the date that the first incident occurred, but he stated in his deposition that it occurred around the time that there was media attention regarding a teenager in the state of Maryland that had committed a crime and fled to Israel, and state prosecutors were trying to extradite the teen. (Doc. No. S-192, Ex. 4: Pla. depo, p. 337, 341-42). An internet search reveals that this event gained media coverage at the end of 1997.

Plaintiff believes that the second incident occurred sometime before the AHCA prohibited Northside from providing dialysis for a month in February of 2008. (Doc. No. S-192, Ex. 4: Pla. depo, p. 348). Plaintiff was in the parking lot at Northside and saw Nutinsky. (Doc. No. S-192, Ex. 4: Pla. depo, p. 349). Plaintiff asked Nutinsky why his (Plaintiff's) privileges had only been renewed for one year, as opposed to two years. (Doc. No. S-192, Ex. 4: Pla. depo, p. 349). Nutinsky became belligerent and raised his voice and said that he was going to shoot Plaintiff. (Doc. No. S-192, Ex. 4: Pla. depo, p. 349). There was no mention of Plaintiff's race during this incident; however, Plaintiff believes that Nutinsky threatened to shoot him based on his Palestinian race, because Plaintiff "can't think of any other reason" why Nutinsky would threaten to shoot him. (Doc. No. S-192, Ex. 4: Pla. depo, p. 349).

The third incident occurred in 2008 at Northside when Nutinsky was the Director of Medical Education and Chief Medical Officer. (Doc. No. S-192, Ex. 4: Pla. depo, p. 343, 346). This incident occurred after Plaintiff raised his quality of care concerns with the AHCA, and the AHCA prohibited Northside from providing dialysis for a month. (Doc. No. S-192, Ex. 4: Pla. depo, p. 344-45). Nutinsky met with Plaintiff and accused Plaintiff of trying to shut the hospital down because Plaintiff was a "Palestinian terrorist." (Doc. No. S-192, Ex. 4: Pla. depo, p. 345).

Plaintiff was asked during his deposition whether there were any other events, remarks, or interactions with Nutinsky that led Plaintiff to believe that he was being discriminated against due to his Palestinian race (other than the three incidents described above). (Doc. No. S-192, Ex. 4: Pla. depo, p. 350). Plaintiff responded that he did not remember any others at that time.[5]

---

[5]In connection with his opposition to the instant motion, Plaintiff submitted a declaration in which he now states that Nutinsky "regularly made derogatory remarks about Palestinians generally, and [Plaintiff] specifically." (Doc. No. S-192, Ex. 1, ¶ 30). However, because this

5

(Doc. No. S-192, Ex. 4: Pla. depo, p. 350).

### 2. Feinman

Plaintiff identifies one incident in which Feinman (who was a member of the MEC at the time[6]) made a racial remark to him. (Doc. No. S-192, Ex. 4: Pla. depo, p. 351-59). Specifically, Feinman spoke with Plaintiff about a problem that Satcher had regarding Plaintiff's conversation with the family of a patient. (Doc. No. S-192, Ex. 4: Pla. depo, p. 351). Satcher had told Feinman that he was upset that Plaintiff had told the patient's family that the dialysis nurse was not properly administering dialysis, and the patient's family complained that they did not want that dialysis nurse performing the dialysis anymore. (Doc. No. S-192, Ex. 4: Pla. depo, p. 351-52). Feinman told Plaintiff that what Plaintiff did put the doctors and hospital at risk for a lawsuit. (Doc. No. S-192, Ex. 4: Pla. depo, p. 352). Plaintiff responded that he had no other option than to speak to the family because his quality of care complaints had not made a difference. (Doc. No. S-192, Ex. 4: Pla. depo, p. 353). Feinman responded, "That's not how we do things at Largo Medical" and that Plaintiff was "practicing medicine the Palestinian way." (Doc. No. S-192, Ex. 4: Pla. depo, p. 353; Doc. No. S-192, Ex. 1, ¶ 31).

Plaintiff was asked during his deposition whether there was any other conversations with Feinman that led Plaintiff to believe that he was being discriminated against due to his

---

allegation of derogatory remarks made on a regular basis conflicts with Plaintiff's deposition testimony that he did not remember any other remarks by Nutinsky other than the three incidents described above, the Court declines to accept this new, directly conflicting allegation that was made without an explanation for the conflict. See Santhuff v. Seitz, 385 Fed. Appx. 939, 943 (11th Cir. 2010). Even if the Court considered this new, conflicting allegation, it would not change the outcome in this case, because there is no evidence that Nutinsky participated in the decision to revoke Plaintiff's privileges.

[6]Feinman was a member of the MEC from 2006 through 2009. (Doc. No. 179-25).

Palestinian race (other than the incident described above). (Doc. No. S-192, Ex. 4: Pla. depo, p. 356). Plaintiff responded that he did not remember any others at that time.[7] (Doc. No. S-192, Ex. 4: Pla. depo, p. 356).

### 3. Satcher

Plaintiff identifies one incident in which Satcher (the CEO at the time) acted discriminatorily towards him. (Doc. No. S-192, Ex. 4: Pla. depo, p. 350-59). Specifically, after the incident with Feinman, Plaintiff called Satcher and relayed the conversation that Plaintiff had with Feinman, including the Palestinian comment. (Doc. No. S-192, Ex. 4: Pla. depo, p. 353-54). Plaintiff stated that it was not a Palestinian issue; it was a patient care issue. (Doc. No. S-192, Ex. 4: Pla. depo, p. 354). In response, Satcher laughed and told Plaintiff that he should listen to Feinman. (Doc. No. S-192, Ex. 4: Pla. depo, p. 354).

Plaintiff was asked during his deposition whether there was any other conversations with Satcher that led Plaintiff to believe that he was being discriminated against due to his Palestinian race (other than the incident described above). (Doc. No. S-192, Ex. 4: Pla. depo, p. 356). Plaintiff responded that he did not remember any others at that time. (Doc. No. S-192, Ex. 4: Pla. depo, p. 356).

---

[7]In connection with his opposition to the instant motion, Plaintiff submitted a declaration in which he now states that Feinman "regularly made negative comments about [Plaintiff], including disparaging remarks about the fact that [Plaintiff is] a Palestinian." (Doc. No. S-192, Ex. 1, ¶ 31). However, because this allegation of derogatory remarks made on a regular basis conflicts with Plaintiff's deposition testimony that he did not remember any other conversations with Feinman other than the one described above, the Court declines to accept this new, directly conflicting allegation that was made without an explanation for the conflict. See Santhuff, 385 Fed. Appx. at 943.

7

### C. Plaintiff's Alleged Disruptive Behavior and the Revocation of His Privileges

In 2006, the MEC appointed an Ad Hoc Committee to investigate Plaintiff's alleged disruptive conduct.[8] (Doc. No. S-199, Ex. 1-Q). In connection with that investigation, Plaintiff met with the Ad Hoc Committee on September 11, 2006. (Doc. No. S-199, Ex. 1-Q). Thereafter, on October 3, 2006, LMC sent Plaintiff a letter stating that the MEC had unanimously concluded that Plaintiff's conduct had been disruptive and that he should not: (1) engage in disruptive conduct when speaking with patients, patients' families, and medical personnel; or (2) make inappropriate entries in medical records regarding his quality of care concerns. (Doc. No. S-199, Ex. 1-Q).

In January of 2009 (after the AHCA had investigated Plaintiff's quality of care complaints related to J.B.'s death), LMC had two doctors (Drs. Paladugu and Steinhoff) review Plaintiff's treatment of J.B., and the doctors opined that Plaintiff's treatment was inappropriate because Plaintiff had failed to timely see J.B. (Doc. No. 179-24, p. 4). Both Paladugu and Steinhoff recommended that review of Plaintiff's treatment of J.B. be referred to the MEC. (Doc. No. 179-24, p. 4). Steinhoff presented the case of J.B. to both the Medical Care Evaluation Committee ("MCEC")[9] and the MEC[10], and Steinhoff also raised concerns regarding Plaintiff's treatment in other patients' cases. (Doc. No. 179-24, p. 4-5).

---

[8]Plaintiff states in his statement of facts that he made a report to the AHCA in July of 2006, and LMC formed an ad hoc committee to investigate Plaintiff's alleged disruptive behavior in August of 2006. (Doc. No. 195, p. 3).

[9]In 2009, the MCEC was composed of ten members. Nutinsky, Feinman, and Satcher were not members of the MCEC. (Doc. No. 179-25).

[10]In 2009, the MEC was composed of 17 members. Feinman was Chairman of the MEC. Nutinsky and Satcher were not members of the MEC. (Doc. No. 179-25).

Thereafter, the MEC invited Plaintiff to attend a meeting in February of 2009 to discuss the case of J.B. (Doc. No. 179-24, p. 5). Additionally, LMC accused Plaintiff of engaging in disruptive behavior due to his writing his concerns regarding the quality of care in patients' charts, including criticizing other health care professionals. (Doc. No. S-199, Ex. 1, ¶ 36). The MEC was not satisfied with Plaintiff's responses to their questions. (Doc. No. 179-24, p. 5). As a result, the MEC recommended that specific cases of Plaintiff's patients be sent out for review by an external peer review organization, the American Medical Foundation ("AMF"). (Doc. No. 179-24, p. 5).

AMF assigned the review of Plaintiff's cases to Dr. Goldfarb. (Doc. No. 179-24, p. 5). Goldfarb was critical of Plaintiff's behavior and the quality of care that Plaintiff had provided. (Doc. No. 179-24, p. 5). Goldfarb recommended that Plaintiff obtain counseling regarding dispute resolution and professionalism and that Plaintiff attend continuing education in the area of fluid and electrolyte management. (Doc. No. 179-24, p. 5). The MEC sent Goldfarb's report to the MCEC for review. (Doc. No. 179-24, p. 5).

Plaintiff contends that the review of his conduct was done in a manner that was inconsistent with the medical staff bylaws and was done with the discriminatory intent to target him because he is Palestinian. For example, LMC had AMF review Plaintiff's treatment of J.B., but LMC did not give AMF J.B.'s entire medical records. Instead, LMC left out critical lab reports and rhythm strips to make it appear that Plaintiff's treatment of J.B. was inappropriate.

On September 21, 2009, LMC sent Plaintiff a letter informing him that the MCEC had begun a focused peer review of his performance in certain identified cases. (Doc. No. S-199, Ex. 1-Q). In the letter, LMC invited Plaintiff to attend the MCEC's meeting on October 7, 2009

9

to discuss the peer review. (Doc. No. S-199, Ex. 1-Q). Additionally, the letter informed Plaintiff that the MCEC would also be addressing his professional conduct that resulted in an interview with the Ad Hoc Committee in 2006, because some of the problems that were addressed at that time needed to be addressed again. (Doc. No. S-199, Ex. 1-Q). Finally, LMC stated that the preliminary findings of the MCEC were that there had been continued incidents of disruptive behavior, inappropriate entries in medical charts,[11] and problems with: (1) electrolyte management, (2) rounding on patients , (3) timely assessments, (4) communicating with family members and staff, and (5) professionalism. (Doc. No. S-199, Ex. 1-Q).

Thereafter, on October 27, 2009, LMC sent Plaintiff a letter acknowledging that Plaintiff had notified LMC that he was unable to attend the October 7, 2009 meeting and requested a new meeting date with more advance notice. (Doc. No. S-199, Ex. 1-N). In this letter, LMC stated that it would reschedule the meeting via a separate letter. (Doc. No. S-199, Ex. 1-N). However, even though a new meeting was being scheduled, the letter informed Plaintiff that the MEC had found that an alternative to corrective action was appropriate. (Doc. No. S-199, Ex. 1-N). Specifically, the MEC was requiring Plaintiff, within 30 days, to: (1) enroll in the Physician Recovery Network ("PRN") to obtain counseling and education on anger management and professionalism; and (2) select continuing education in the area of fluid and electrolyte management and sodium/water balance.[12] (Doc. No. S-199, Ex. 1-N). This letter was signed by

---

[11] Plaintiff would write requests for incident reports in the charts of patients that detailed specific and serious quality of care issues, many of which led to the AHCA investigations and citations. (Doc. No. S-199, Ex. 1, ¶ 75).

[12] One of Plaintiff's sub-specialties within nephrology is fluid and electrolyte management, and he has given lectures on that topic. (Doc. No. S-199, Ex. 1, ¶ 74). As such, Plaintiff believes that LMC's requirement that he take continuing education on this subject was

Feinman (as Chief of Staff) and Satcher (as Chief Executive Officer).  (Doc. No. S-199, Ex. 1-N).  The next day, on October 28, 2009, LMC sent Plaintiff a letter informing him that the MCEC would be meeting on November 12, 2009 and inviting him to come to the meeting to discuss his performance relating to certain identified cases.  (Doc. No. S-199, Ex. 1-M).

Plaintiff did not attend the November 12, 2009 meeting, and instead, Plaintiff submitted written responses to the MCEC's concerns at the end of November and early December.  (Doc. No. 179-24, p. 7-8).  However, Plaintiff did not provide proof of enrollment in the PRN or of his selection of continuing education courses by the November 30, 2009 deadline.  (Doc. No. 179-24, p. 8).

On December 8, 2009, the MEC met and discussed Plaintiff's failure to enroll in the PRN or select continuing education courses.  (Doc. No. 179-24, p. 8).  During the meeting, a motion was made to terminate Plaintiff's privileges due to his failure to enroll in the PRN or select continuing education courses.  (Doc. No. 179-24, p. 8).  The motion was passed by a vote of twelve for revocation (one member abstained from voting and one member did not cast a vote).  (Doc. No. 179-24, p. 8).  However, on December 16, 2009, LMC gave Plaintiff one final opportunity to enroll in the PRN and select continuing education courses by December 18, 2009.  (Doc. No. 179-49).  Plaintiff did not comply.

On December 21, 2009, LMC sent Plaintiff a letter that stated that the MEC had met on December 8, 2009 and recommended revocation of Plaintiff's staff privileges because Plaintiff had failed to enroll in the PRN and failed to select continuing education courses pursuant to LMC's October 27, 2009 letter.  (Doc. No. S-199, Ex. 1-O; Doc. No. 179-24, p. 8).  This letter

---

purposefully offensive.  (Doc. No. S-199, Ex. 1, ¶ 74).

11

was signed by Feinman and Satcher. (Doc. No. S-199, Ex. 1-O).

In response, on January 21, 2010, Plaintiff requested a hearing and appellate review of the MEC's recommendation that his privileges be revoked. (Doc. No. S-199, Ex. 1-P). On September 23, 2010, LMC sent Plaintiff a letter setting a hearing for November 9, 2010. (Doc. No. S-199, Ex. 1-Q). LMC's letter informed Plaintiff of the identity of the three-person Hearing Committee (Drs. Rosin, Requena, and Ramamurthy) and of the Hearing Officer (James Case). (Doc. No. S-199, Ex. 1-Q). Additionally, LMC identified its intended witnesses, which included Feinman. (Doc. No. S-199, Ex. 1-Q). This letter was signed by Satcher. (Doc. No. S-199, Ex. 1-Q). The hearing was conducted on November 9, 10, and 22, 2010. (Doc. No. S-199, Ex. 1-R).

Plaintiff contends that the hearing was conducted in a manner that was inconsistent with the medical staff bylaws and was done with the discriminatory intent to target him because he is Palestinian. For example, Plaintiff contends that two of the three members of the Hearing Committee (Drs. Requena and Ramamurthy) should not have been appointed to the Hearing Committee, because Requena participated in the 2006 investigation of Plaintiff's allegedly disruptive conduct and Ramamurthy was not a member of LMC's medical staff.

On January 12, 2011, the Hearing Committee issued its report, in which it made the following findings and conclusions: (1) Plaintiff failed to comply with the MEC's requirements that he enroll in the PRN and select continuing education courses, and he failed to show that such requirements were unreasonable or that he was justified in failing to comply; and (2) Plaintiff's approach to resolving quality of care concerns in the hospital was disruptive. (Doc. No. S-199, Ex. 1-R). As a result, the Hearing Committee concluded that there was a sufficient basis for the MEC's decision to revoke Plaintiff's privileges. (Doc. No. S-199, Ex. 1-R).

However, the Hearing Committee ended the report with a non-binding suggestion that the MEC consider giving Plaintiff one final opportunity to comply with the MEC's requirements that he enroll in the PRN and select continuing education courses. (Doc. No. S-199, Ex. 1-R). On January 18, 2011, the MEC met to consider the Hearing Committee's report and "an overwhelming majority" of the MEC voted to affirm the revocation of Plaintiff's privileges.[13] (Doc. No. S-199, Ex. 1-R). On January 19, 2011, LMC sent a letter to Plaintiff informing him of the Hearing Committee's report and the MEC's decision. (Doc. No. S-199, Ex. 1-R).

Plaintiff submitted a written appeal to LMC's Board of Trustees. On May 5, 2011, LMC sent Plaintiff a letter that stated that after the completion of appellate review conducted at their May 3, 2011 meeting, LMC's Board of Trustees upheld the recommendation of the MEC and Hearing Committee to revoke his privileges. (Doc. No. S-199, Ex. 1-S). This letter was signed by Satcher. (Doc. No. S-199, Ex. 1-S).

### D.  Lawsuit

On July 25, 2011, Plaintiff filed suit against LMC. In his Second Amended Complaint, Plaintiff asserts five claims: (1) a § 1981 claim seeking damages, (2) a § 1981 claim seeking injunctive relief, (3) a fraud claim, (4) a breach of medical staff bylaws claim seeking damages, and (5) a breach of medical staff bylaws claim seeking injunctive relief.

### III.  Motion for Summary Judgment

In the instant motion, LMC seeks summary judgment on all of Plaintiff's claims. As explained below, the Court finds that LMC is entitled to summary judgment on Plaintiff's § 1981

---

[13] In 2011, the MEC was composed of 13 members. Nutinsky, Feinman, and Satcher were not members of the MEC in 2011. (Doc. No. 179-25).

claims and declines to exercise supplemental jurisdiction over the remaining state law claims.

### A.  Section 1981 Claims

Plaintiff asserts two § 1981 race discrimination claims against LMC.[14]  When analyzing these claims, the Court employs the following framework:[15]

> [T]he burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies.  Under this framework, the plaintiff must first establish a *prima facie* case, which creates a presumption of unlawful discrimination . . . .  The employer may then rebut that presumption with legitimate, non-discriminatory reasons for the adverse employment acts.  The employee must then proffer sufficient evidence to create a genuine issue of material fact that the defendant's articulated reasons are pretextual.

Beal v. Convergys Corp., 489 Fed. Appx. 421, 423 n.4 (11th Cir. 2012)(internal citation omitted).

In order to establish a prima facie case, Plaintiff must show: (1) that he is a member of a protected class (he is Palestinian); (2) that he was subjected to an adverse employment action (his medical staff privileges were revoked); (3) that LMC treated similarly-situated, non-Palestinian doctors more favorably; and (4) that he was qualified to have privileges at LMC.  See Lewis v. City of Kennesaw, Georgia, 504 Fed. Appx. 880, 882 (11th Cir. 2013)(citation omitted).  The parties dispute whether Plaintiff can show that LMC treated similarly-situated,

---

[14]Section 1981 "protects an individual's right to be free from discrimination in the 'making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'"  Lewis v. City of Kennesaw, Georgia, 504 Fed. Appx. 880, 881 (11th Cir. 2013)(quoting 42 U.S.C. § 1981(a), (b)).

[15]Section 1981 and Title VII claims are analyzed under the same analytical framework. See id.

14

non-Palestinian doctors more favorably. The Court notes that "[w]hen a plaintiff alleges discriminatory discipline, the quantity and quality of the comparator's misconduct must be nearly identical to the plaintiff's." Id. (citation omitted).

In the instant case, Plaintiff identifies 23 alleged comparators, but Plaintiff does not devote any significant time in his brief addressing the similarity of the comparators to Plaintiff. At the hearing, Plaintiff attempted to expand on this issue with regards to three comparators—Comparators 1, 13, and 17.[16] Plaintiff focused on the comparator's alleged "unprofessional" conduct and compared it with Plaintiff's alleged incidents of disruptive behavior, inappropriate entries in medical charts, lack of professionalism, and problems with electrolyte management. However, Plaintiff's alleged inappropriate behavior was only one of the reasons that his privileges were revoked; the other reason was his failure to comply with the requirements that he enroll in the PRN and select continuing education courses. As such, the relevant comparators are doctors who were disruptive <u>and</u> refused to comply with LMC's informal requirements (such as obtaining counseling and/or attending continuing education courses) but did not have their staff privileges revoked. Plaintiff does not identify any such doctors, and consequently, Plaintiff fails to show that any similarly situated comparators were treated more favorably.

Even though Plaintiff cannot establish that LMC treated similarly-situated, non-Palestinian doctors more favorably, the Court notes that such does not automatically end the inquiry:

---

[16] At the end of the hearing, Plaintiff also requested that the Court consider Comparator 18.

> The McDonnell Douglas framework is not, however, the only way to use circumstantial evidence to survive a motion for summary judgment, and a plaintiff's failure to produce a comparator does not necessarily doom his case. Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.

Lewis, 504 Fed. Appx. at 882 (quotation marks and internal citations omitted). Plaintiff, however, has not shown that the record, viewed in the light most favorable to him, presents circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.

The only discriminatory remarks identified by Plaintiff are from three people: (1) Nutinsky, (2) Satcher, and (3) Feinman. Plaintiff conceded at the hearing that Nutinsky was not involved in the decision-making process that resulted in the revocation of Plaintiff's privileges. Thus, only Satcher and Feinman are decision-makers that are alleged to have discriminatory animus. Further, the only discriminatory remark that was made (and could be considered evidence of racial animus) was Feinman's one comment to Plaintiff. Specifically, Feinman and Plaintiff were discussing an incident where Plaintiff told a patient's family that a dialysis nurse was not properly administering dialysis, and Plaintiff stated that he had no other option than to speak to the family because his quality of care complaints had not made a difference. In response, Feinman stated, "That's not how we do things at Largo Medical" and that Plaintiff was "practicing medicine the Palestinian way." (Doc. No. S-192, Ex. 4: Pla. depo, p. 353; Doc. No. S-192, Ex. 1, ¶ 31). This one comment is not sufficient to create "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the

16

decisionmaker." Lewis, 504 Fed. Appx. at 882 (quotation marks and internal citations omitted).

Furthermore, other decision-makers on the MCEC, MEC, Hearing Committee, and Board of Trustees (whom are not alleged to have a discriminatory animus toward Plaintiff) were involved in the decision to revoke Plaintiff's privileges, and their involvement affects Plaintiff's § 1981 claim. In such a situation, any alleged bias on the part of one member of a decision-making committee cannot be imputed to the entire committee. See Rolle v. Worth County School District, 128 Fed. Appx. 731, 733 (11th Cir. 2005); Conner v. Lafarge North America, Inc., 343 Fed. Appx. 537, 543-44 (11th Cir. 2009); Warner v. Columbia/JFK Medical Center, LLP, 305 Fed. Appx. 610, 612 (11th Cir. 2008).

For example, in Rolle, the plaintiff filed a discrimination lawsuit against the Worth County Board of Education. See Rolle, 128 Fed. Appx. at 731. The Rolle court concluded that the plaintiff's claim failed, because he did not show that a majority of the Board was motivated by an improper purpose. See id. at 733. Instead, the Rolle court stated that "the only possible evidence of motive relates to a single Board member, but an improper motive of one member does not impart discrimination on the entire Board." Id.; see also Conner, 343 Fed. Appx. at 544 (stating that any alleged bias on the part of one member of an interview panel could not be imputed to the entire panel).

Likewise, in Warner, the plaintiff brought a discrimination lawsuit against a hospital regarding the hospital's credentialing process. See Warner, 305 Fed. Appx. at 610. When the case went to trial, the district court instructed the jury that the plaintiff had to prove that a majority of the credentialing committee were unlawfully motivated by race. See id. at 611. The jury found in favor of the hospital, and the plaintiff appealed. See id. Upon review, the

17

appellate court concluded that the jury instruction was a correct statement of the law. See id. at 612.

In the instant case, Plaintiff has not presented any evidence that a majority of any of the committees involved in the decision to revoke his privileges—the MCEC, the MEC, the Hearing Committee, or the Board of Trustees—harbored racial animus. Given the multi-level review that occurred and given that many people formed the committees that made the decision or recommendation at each level of review, the Court concludes that the evidence of alleged racial animus by Satcher and Feinman is not sufficient to create a genuine issue of material fact regarding whether the decision to revoke Plaintiff's privileges was motivated by race discrimination.

However, even if Plaintiff could establish a prima facie case of race discrimination, LMC has asserted a legitimate, non-discriminatory reason for its decision to revoke Plaintiff's privileges—Plaintiff failed to enroll in the PRN or select continuing education courses. Plaintiff contends that the proffered reason is pretextual, because LMC did not strictly adhere to Section 3.19 of the Bylaws[17] for dealing with Plaintiff's alleged disruptive behavior. However, as previously stated, Plaintiff's alleged disruptive behavior is only one of the reasons given for the revocation of his privileges; his failure to enroll in the PRN and select continuing education courses is the other reason. It is undisputed that Plaintiff failed to comply with LMC's directives that he enroll in the PRN and select continuing education courses, and Plaintiff has not addressed that legitimate, non-discriminatory reason head on to rebut it. Thus, Plaintiff has not shown that LMC's reason that Plaintiff failed to comply with its directives is pretextual, since Plaintiff has

---

[17]Section 3.19 of the Bylaws can be found at Doc. No. 46-11, at pages 15 through 18.

not "shown both that the reason was false and that discrimination was the real reason." Garcia v. DS Waters of America, Inc., 372 Fed. Appx. 925, 927 (11th Cir. 2010)(citation omitted).

Accordingly, for the reasons set forth above, the Court concludes that Plaintiff has not shown that a genuine issue of material fact exists regarding whether he can show a prima facie case of discrimination or that LMC's proffered reason was pretextual. Therefore, Defendant is entitled to summary judgment on Plaintiff's discrimination claims.

### B. Supplemental Jurisdiction

Because this Court has granted summary judgment on Plaintiff's federal claims, this Court may decline to exercise supplemental jurisdiction over the remaining state law claims, pursuant to 28 U.S.C. § 1367(c)(3). Upon consideration, the Court declines to exercise supplemental jurisdiction over the remaining state law claims.

### IV. Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Defendant's Motion for Summary Judgment (Doc. No. 179) is **GRANTED TO THE EXTENT** that Defendant seeks summary judgment on Plaintiff's § 1981 claims.

(2) The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

(3) The Clerk is directed to terminate all remaining pending motions, to enter judgment in favor of Defendant on Counts I and II, and to close the case.

**DONE AND ORDERED** at Tampa, Florida, this 21st day of August, 2013.

Copies to: Counsel of Record

SUSAN C. BUCKLEW
United States District Judge